1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RICHARD B. EDMONDS,

               Plaintiff,

     v.

MARK H. GETTY, et al.,

               Defendants.

CASE NO. C07-317JLR

ORDER

Richard B. Edmonds filed this derivative action on behalf of nominal Defendant Getty Images, Inc. ("Getty Images") against certain members of Getty Images' Board of Directors (the "Board") and certain executive officers.  Mr. Edmonds alleges violations of § 10(b) and Rule 10b-5 of the Securities and Exchange Act; § 14(a) of the Securities Exchange Act; and § 20(a) of the Securities Exchange Act.  Mr. Edmonds also alleges claims for breach of fiduciary duty and/or aiding and abetting; unjust enrichment; constructive fraud; corporate waste; and insider selling and misappropriation of information.  Nominal Defendant Getty Images filed a motion to dismiss for failure to make a litigation demand under Federal Rule of Civil Procedure 23.1 (Dkt. # 14).  Mr. Edmonds then filed an amended complaint (Dkt. # 16).  The court allowed Mr. Edmonds

ORDER – 1

to file a Surreply (Dkt. # 22).  Having considered the papers filed in support of and in opposition to the motion and having heard argument from counsel, for the reasons that follow, the court DENIES the motion.  The court finds that demand was futile because there is reason to doubt that a majority of the directors at the time the complaint was filed could have properly exercised their independent and disinterested business judgment in responding to a demand.

## I.  BACKGROUND

On March 18, 2006, the *Wall Street Journal* published an article entitled "The Perfect Payday" which suggested that backdating may have been rampant throughout the 1990s up until 2002 when the Sarbanes-Oxley corporate reform act was enacted. Spoonemore Decl. (Dkt. # 19) Ex. A.  Backdating occurs when a stock option's grant date is altered to an earlier date with a lower, more favorable price to the recipient.  The article analyzed grants at several companies and determined that the odds of several grants all occurring on days in which the stock prices were very low were worse than winning the Powerball lottery.  *Id.*  The Securities and Exchange Commission ("SEC") began investigating several companies to determine whether the patterns uncovered were simply due to chance or whether the grants had been backdated.  The article spawned litigation alleging backdating of stock options against some of the companies named in the article as well as others that were not named, like Getty Images, in courts throughout the country.

On November 9, 2006, in response to an informal inquiry by the SEC, Getty Images announced that it had undertaken an internal investigation of stock option grant practices.  Spoonemore Decl. Ex. C.  A Special Committee was formed and tasked with investigating Getty Images' stock option grant practices and related accounting for stock option grants.  *Id.*  The Committee included two independent members of the Board, Alan

ORDER – 2

G. Spoon and Michael A. Stein, who were assisted by outside counsel, Orrick, Herrington & Sutcliffe.  Spoonemore Decl. Ex. E.

On January 29, 2007, a case alleging improper accounting and disclosure of option grants entitled *Lopez v. Mark H. Getty, et al.*, was filed in King County, Washington. Mot. at 4.  It is Getty Images' view that the claims in that case are "substantially similar" to the claims in this case.  *Id.*  On February 14, 2007, the Board converted the Special Committee into a Litigation Committee.  Spoonemore Decl. Ex. J.  Mr. Spoon and Mr. Stein continued on as members of the Committee.  *Id.*  The Special Litigation Committee was given the "power and authority to investigate, analyze and evaluate the derivative claims raised in the [*Lopez*] Litigation, to consider and determine whether prosecution of the derivative claims in the [*Lopez*] Litigation is in the best interests of the Company and its stockholders, and to determine the actions, if any, the Corporation should take with respect to the derivative claims in the [*Lopez*] Litigation . . . ."  Spoonemore Decl. Ex. J.

On March 2, 2007, Mr. Edmonds filed this lawsuit (Dkt. # 1).

On April 16, 2007, a press release was issued that detailed the conclusions of the Committee.  Spoonemore Decl. Ex. E.  The Committee reviewed equity compensation grant practices and awards made by Getty Images between July 14, 1994 and November 1, 2006 which covered 8,164 grants made on 465 occasions.  *Id.*  The Committee "concluded that the evidence obtained and reviewed in its investigation did not establish any intentional wrongdoing by current employees, officers or directors of the Company . . . ."  *Id.*  However, the Committee

> determined that incorrect measurement dates for certain equity compensation awards made during the Relevant Period were used for financial accounting purposes and, as a result, the Company will restate its prior financial statements to correct the accounting for those awards.  The use of incorrect measurement dates resulted from a number of reasons, including delays in the approval of awards, the absence of definitive documentation and modifications of previously awarded grants.  The Special Committee also identified certain awards for which grant dates were selected retroactively.  However, the

ORDER – 3

Special Committee has concluded that the evidence does not establish that there was any intentional wrongdoing in connection with those awards. Nearly all of the grants for which the measurement dates are being changed (approximately 98% of the grants) were awarded in 2001 and earlier years. The Company anticipates that the restatement will involve total pre-tax, non-cash stock-based compensation expense of approximately $28 million to $32 million, of which approximately 95% will be expensed in 2002 and earlier years. Because these estimates are preliminary and we have not quantified all of the tax impacts, the net after tax amounts to be restated have not yet been determined by the Company.

*Id.* The Committee determined that it was necessary to revise the measurement dates for 3,700 of the grants that were made on approximately 130 occasions.  Spoonemore Decl. Ex. E.  It noted that over half of the grants for which the measurement dates were being revised related to an all employee award in February 2000 given to all employees below the vice president level.  *Id.*

The Special Committee recommended, and the Board adopted, the following changes "to improve the Company's equity compensation grant practices."  *Id.*  The recommendations included adding two additional independent directors to the Board; changing the membership of the audit and compensation committees; discontinuation of the equity compensation committee; enhancements to the oversight of Getty Images' corporate governance practices; charging senior management with ensuring that equity compensation policies and processes are appropriate and provide effective controls and that Getty Images' accounting for equity compensation is appropriate; moving certain of Getty Images' equity compensation administrative processes and functions from its human resources organization to the finance organization; and adopting a new equity compensation grant policy.  Spoonemore Decl. Ex. E.

Getty Images points to one of the "significant" effects of the Committee's work as being its decision to restate certain financial statements.

On June 13, 2007, Getty Images filed:  (a) its Form 10-K for the fiscal year ending December 31, 2006; and (b) amended Quarterly Reports on Form 10-Q/A for the quarters ending March 31, 2006 and June 30, 2006.  These filings

ORDER – 4

served to restate:  (i) the consolidated financial statements for the fiscal years ending December 31, 2005 and 2004; (ii) selected consolidated financial data for fiscal years ending December 31, 2005, 2004, 2003, and 2002; and (iii) unaudited quarterly financial data for each quarter in its fiscal year ending December 31, 2005 and the first and second quarters of fiscal year 2006.

Mot. at 7; Spoonemore Decl. Exs. F, G.

## II. ANALYSIS

A shareholder seeking to bring a derivative action on behalf of a corporation must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile.  *See* Fed. R. Civ. P. 23.1.  The federal rules however do not establish the circumstances under which demand would be futile.  *In re Silicon Graphics Inc.*, 183 F.3d 970, 989-90 (9th Cir. 1999).  Courts look to the law of the state of incorporation to determine whether demand in a particular case would have been futile.  *Id.* at 990.  Getty Images is a Delaware corporation and so the law of Delaware applies.

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."  *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244, 254 (Del. 2000).  Delaware has two tests for determining whether demand is futile.  The first, the "*Aronson* test," excuses a failure to make a demand where a plaintiff raises a reason to doubt that:  (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of the directors' valid exercise of business judgment.  *Id.* at 814.  "The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."  *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).  The Delaware Supreme Court instructs that where the board that would consider the demand did not make the decision being challenged, that courts should apply a different test, the "*Rales*

ORDER – 5

test." *Id.* at 933-34.   Under *Rales*, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile." *Id.* at 934.  Here, where the challenged transactions were not made by the Board, or even half of its members, *Rales* applies.

At the time the complaint was served, the Board consisted of the following directors:  James N. Bailey, Andrew S. Garb, Mark H. Getty, Jonathan D. Klein, Alan G. Spoon, Christopher H. Sporborg and Michael A. Stein.  Am. Compl. ¶¶ 23-37.  In order to find that demand is excused in this case, the court would need to find that Mr. Edmonds' allegations raise a reasonable doubt that at least four of these directors, a majority of the Board, could have properly exercised their independent and disinterested business judgment in evaluating a demand.

**A.    Mr. Spoon and Mr. Stein**

Mr. Edmonds does not make any allegations that Mr. Spoon and Mr. Stein were not disinterested at the time the complaint was filed.  The court finds that these directors were disinterested at the time the complaint was filed.

**B.    Mr. Getty, Mr. Klein, and Mr. Sporborg**

Mr. Edmonds alleges that Mr. Getty, Mr. Klein, and Mr. Sporborg received backdated stock options.  Am. Compl. ¶¶ 25, 29, 33.  At the pleading stage the question is whether the plaintiff has alleged circumstances from which it may be reasonably inferred that backdating as opposed to an innocent bookkeeping error occurred.  *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 956 (N.D. Cal. 2007).  "A director is considered interested where he or she will receive a personal financial benefit from a transaction that

ORDER – 6

is not equally shared by the stockholders.  Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936.  "[D]irectors receiving backdated stock options receive a benefit *not* shared by stockholders.  When purchasing the company's stock, the shareholders do not have the benefit of reaching back in time to buy their shares at [a] low-price point." *In re Zoran Corp.*, 511 F. Supp. 2d 986, 1002-03 (N.D. Cal. 2007) (applying Delaware law).  "Directors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood." *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007) (quotation marks and citation omitted).  Allegations that a board member accepted backdated options raise a reason to doubt the disinterestedness of the board and to suggest that they were incapable of impartially considering a demand. *Id.* at 356; *see also Zoran*, 511 F. Supp. 2d at 1003 (N.D. Cal. 2007) ("[I]f plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested.")

Mr. Edmonds alleges that 21 out of 25 discretionary grant dates from April 1999 to February 2002 were backdated.  Am. Compl. ¶ 114.  Eight grants were made at or near the lowest price of the fiscal year and fourteen were made at or near the lowest price of the fiscal quarter. *Id.* It is alleged that Mr. Getty received backdated options on October 22, 1999 (15,000 options at an exercise price of $19.07), April 28, 2000 (400,000 options at an exercise price of $30.32), May 24, 2000 (400,000 options at an exercise price of $28.63), March 30, 2001 (50,000 options at an exercise price of $16.85), and October 15, 2001 (50,000 options at an exercise price of $12.41); Mr. Klein received backdated options on October 22, 1999 (15,000 options at an exercise price of $19.07), April 28, 2000 (400,000 options at an exercise price of $30.32), May 24, 2000 (400,000 options at

ORDER – 7

an exercise price of $28.63), March 30, 2001 (50,000 options at an exercise price of $16.85), May 7, 2001 (232,000 options at an exercise price of $25.43), June 26, 2001 (170,000 options at an exercise price of $25.43), and October 15, 2001 (50,000 options at an exercise price of $12.41); and Mr. Sporborg received a backdated option grant on July 23, 2001 (8,333 options at an exercise price of $15.80).  Am. Compl. ¶¶ 25, 30, 33.

In *Ryan*, 918 A.2d at 354, a Delaware court found that the allegations in the complaint raised a reasonable doubt as to whether the challenged transactions were a valid exercise of business judgment.  The *Ryan* court first looked to the fact that "the terms of the stock option plans *required* that '[t]he exercise price of each option shall be not less than one hundred percent (100%) of the fair market value of the stock subject to the option on the date the option is granted.'  The board had no discretion to contravene the terms of the stock option plans.  Altering the actual date of the grant so as to affect the exercise price contravenes the plan."  *Id.*  Second, the court examined plaintiff's allegations that every challenged option occurred during the lowest market price of the month or year in which it was granted.  *Id.*  The court noted that plaintiff further supported his allegations with "empirical evidence" that backdating occurred.  Specifically, plaintiff used an analysis developed by Merrill Lynch[1] to determine that the average annualized return of 243% on option grants to management was nearly ten times higher than the 29% annualized market returns in the same period.  *Id.*  The court found that the "appearance of impropriety grows even more when one considers the fact that the board granted options, not at set or designated times, but by a sporadic method."  *Id.* at 355.  The court stated that, "[t]his timing by my judgment and by support of empirical

---

[1]The Merrill Lynch analysis examines the 20-day performance of each option grant reported in a company's proxy statements during the relevant period.  Am. Compl. at ¶ 183.  Under the analysis a calculation of the annualized return of the option grants at 20 days after the grant is made, which is then compared with the company's overall annual return.  *Id.*

data, seems too fortuitous to be mere coincidence." *Id* at 354-55.  The court concluded: "Plaintiff here points to specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures.  Such facts, in my opinion, provide sufficient particularity in the pleading to survive a motion to dismiss for failure to make demand pursuant to Rule 23.1." *Id.* at 355.  The court also determined that if the case were analyzed under the *Rales* rather than the *Aronson* test that demand would have still been futile.  *Id.*

Mr. Edmonds models his complaint after the complaint in *Ryan*.  Mr. Edmonds alleges that:  "Under the 1998 Plan, the exercise price of options must be 'no less than 100% of the Fair Market Value per share on the date of the grant,' where fair market value is defined as 'the average of the high and low prices of the Common Stock on such exchange or such quotation on the date set for valuation.'"  Am. Compl. ¶ 112.  In other words, if backdated options were granted it would have been against the plan.

Mr. Edmonds next alleges that "21 out of 25 discretionary grant dates from April 1999 to February 2002 were backdated, and the pattern of grants was more than fortuitous – eight were made at or near the lowest price of the fiscal year, and fourteen were made at or near the lowest price of the fiscal quarter." Am. Compl. ¶ 114.  For each of the challenged grants, Mr. Edmonds alleges the date on which the grant was awarded, to whom the options were awarded, and the number of options awarded. *See, e.g.*, Am. Compl. ¶¶ 125-128.  Mr. Edmonds also provides graphs charting the grant date against the price for each grant for both the quarter in which the grant was issued and the fiscal year in which it was issued. *See, e.g.*, Am. Compl. ¶ 128.  While this evidence is not as compelling as the evidence in *Ryan* (that each grant was at the lowest price of the month or year in which it was granted) it does show that grants were made when stock prices

ORDER – 9

were low.  As the court in *CNET* noted in response to an argument by defendants that not all grants fell on the lowest possible price of the relevant period:  "This argument is like giving a bank robber credit for leaving some cash in the vault.  Perhaps they did not want to make it too obvious by being too greedy.  The simple fact that there were days close in time where the stock closed at an even lower price is not sufficient to defeat the facts pleaded by plaintiffs."  483 F. Supp. 2d at 961.

Using the analytical framework developed by Merrill Lynch, Mr. Edmonds alleges that for the options granted in 1999, the average 20-day return is 25.57% or 460.31% annualized as compared to a 176.26% annualized return to investors.  Am. Compl. ¶ 186. Mr. Edmonds alleges that applying the Merrill Lynch analysis for the option grants in 2000, the average 20-day return is 10.22% or 183.91% annualized as compared to a -34.03% annualized return to investors in 2000.  Am. Compl. ¶ 187.  For the grants in 2001, the average 20-day return is 17.04% or 306.76% annualized, as compared to a -26.37% annualized return to investors in 2001.  Am. Compl. ¶ 188.  Over the three year period the average annualized return to management on the option grants identified was 317% as compared to a 38.62% average annualized return to investors.  Am. Compl. ¶ 189.

Finally, Mr. Edmonds labels these grants as "discretionary" leading to the conclusion that they were not part of any overall plan setting forth at what time options were to be given.  *See* Am. Compl. ¶ 114.  At oral argument counsel for Getty Images stated that these grants were not, in fact, issued pursuant to any overall plan.

Getty Images claims that Mr. Edmonds has failed to allege circumstances from which it may be reasonably inferred that backdating as opposed to innocent bookkeeping errors occurred.  First, it attacks Mr. Edmond's use of the Merrill Lynch analysis.  Getty Images points out that Merrill Lynch itself did not conclude that any of the companies its

report examined actually backdated options.  Reply at 7.  In doing so, Getty Images

stretches what the report actually says.  In the report, Merrill Lynch merely emphasized

that they were not taking any position on whether companies actually backdated options.

Supp. Spoonemore Decl. (Dkt. # 19) Ex. N.  Additionally, at the pleading stage, the

plaintiff need not prove that backdating occurred but rather must only allege

circumstances from which it may be reasonably inferred that backdating as opposed to an

innocent bookkeeping error occurred.  *See CNET*, 483 F. Supp. 2d at 956.

Getty Images next argues that companies are more likely to issue grants when they

perceive their stock to be undervalued.  Reply at 8.  Getty Images provides no evidence

that this is the case here.  Getty Images also asserts that many investors take the issuance

of grants as a signal from the company that it believes its shares are undervalued.  *Id.*

Again, it is not clear from the papers filed by Getty Images whether this may have been

the case here.

Getty Images also claims that the reliability of a 20-day analysis is suspect if the

stock is volatile.  *Id.*  It argues, citing *In re PMC-Sierra, Inc.*, No. 06-05330, 2007 WL

2427980, *3 (N.D. Cal. Aug. 22, 2007), that there is nothing magical about a 20-day

window.  Getty Images attached an Appendix to its motion showing that at least, for some

periods its stock price was subject to large variations over 20, 30 and 40-day periods.

Mot. at Appendix B.  It argues that an examination of the stock price over a 40-day

period demonstrates that no pattern of backdating exists.  Reply at 10.  Getty Images fails

to explain in its papers why a 40-day period is better than a 20-day period or why its

analysis is superior to or more reliable than the analysis employed by Mr. Edmonds.

And, at oral argument, counsel for Getty Images conceded that the selection of a 40-day

window was no better than the 20-day period.  It also complains that the alleged pattern is

driven by two grants made in a single month that resulted in a 1,500% gain.  Reply at 9.

ORDER – 11

Again, Getty Images fails to clearly and cogently explain or demonstrate how this adversely affected the analysis. The court is not inclined to adopt Getty Images' analysis without an explanation of why it is superior to or more reliable than the analysis presented by Mr. Edmonds.

Lastly, Getty Images argues that external events *may* have a dramatic effect on a company's annualized returns. Reply at 9. Specifically, Getty Images points to the bursting of the Internet bubble and the events of September 11, 2001. *Id.* It states that grants awarded to officers and directors in early 2001 had significantly higher returns than the annualized returns to investors for that year. *Id.* Getty Images again fails to explain why this makes Mr. Edmonds' use of the Merrill Lynch analysis here improper.

Getty Images also cites several cases, some of which are un-published and none of which are binding on this court, in which it was found that demand was not futile. These cases are all distinguishable on their facts. In *CNET*, the court refused to find demand excused where plaintiffs failed to plead facts about the full universe of options (as opposed to only those options granted at a low-point in price), when the options were granted, under what circumstances the options were granted or any facts regarding the board's role in granting the options. 483 F. Supp. 2d at 958. In *In re Verisign, Inc.*, No. 06-4165, 2007 WL 2705221, *15 (N.D. Cal. September 14, 2007) the court would not excuse demand where the complaint contained "no particularized allegations stating which director or directors approved which grant, or when such grant was approved and how it was backdated-and no allegations showing how or why a particular director would know that the options were backdated." The court also noted that "while it is not clear from the [complaint] whether the Board approved the option grants, it appears that a majority of the current members of the Board were not directors at the time of the alleged backdating." *Id.* The court in *Desimore v. Barrows*, 924 A.2d 908, 914, 920-21 (Del.

ORDER – 12

Ch. 2007) declined to find demand excused where, for at least some of the challenged options, there was no requirement that grants be priced at fair market value on the date of the grant and the complaint was devoid of any factual allegations on the key issues of who approved the employee grants and whether any of the directors knew that options were being backdated.  In *In re Openwave Sys. Inc.,* 503 F. Supp. 2d 1341, 1351 (N.D. Cal. 2007), the court found that plaintiffs failed to "compare the average 20 day return on *all* reported stock option grants during the relevant period to the average 20 day return on Openwave stock during the period."  The court concluded that the plaintiffs' allegations and statistical analyses were insufficient to allow a reasonable inference of backdating. *Id.*  In *In re Linear Tech. Corp.*, No. 06-3290, 2006 WL 3533024, *3 (N.D. Cal Dec. 7, 2006), the court found that demand was not futile stating:  "[P]laintiffs provide no facts as to how often and at what times the Committee Defendants have granted stock options in the past, no 'pattern,' let alone a 'striking' one, is apparent.  Moreover, plaintiffs have failed to allege facts as to how the asserted backdating affected the price the Officer Defendants ultimately paid for the stock, and, as a consequence, have failed to demonstrate, let alone with particularity, the Committee Directors' approval of the options harmed Linear."  In *PMC-Sierra,* 2007 WL 2427980 at *4-6 the court found demand was not excused where plaintiff did not present an adequate statistical analysis to negate the prospect that the favorable grant dates were merely fortuitous, did not examine all options granted during the relevant period and failed to allege other facts raising an inference that backdating occurred.  None of these deficiencies are present here.

The court does not find Getty Images' arguments persuasive; instead, it adopts the reasoning in *Ryan* and finds that Mr. Edmonds alleged facts sufficient to reasonably infer that backdating rather than innocent bookkeeping errors occurred.  The court also finds that Mr. Edmonds' allegations that Board members, Mr. Getty, Mr. Klein, and Mr.

Sporborg accepted backdated options coupled with the allegations raising a reasonable inference that backdating occurred are sufficient to raise a reason to doubt these directors' disinterestedness and to suggest that they would have been incapable of impartially considering a demand. *See Ryan*, 918 A.2d at 356; *see also Zoran Corp.*, 511 F. Supp. 2d at 1003 ("[I]f plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested.")

**C.    Mr. Bailey, Mr. Garb, and Mr. Sporborg**

"[I]ntentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith." *Ryan*, 918 A.2d at 358. "A director who approves the backdating of options faces at the very *least* a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders . . . and yet satisfy his duty of loyalty. Backdating options qualifies as one of those 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Id.* at 355-56 (citing *Aronson*, 473 A.2d at 815). And as *Ryan* teaches "[d]irectors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood." *Id.* at 355 (citation and quotation marks omitted).

Mr. Edmonds alleges that Mr. Bailey and Mr. Sporborg were members of the compensation committee from 1998 through 2006 and that Mr. Garb was the chairman of the compensation committee from 1998 through 2006. Am. Compl. ¶ 98. Mr. Edmonds also alleges that during the relevant time period Mr. Bailey, Mr. Garb, and Mr. Sporborg had the authority to administer the stock option plans and grant stock options thereunder;

ORDER – 14

were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of the grant; that they approved the challenged grants on a date after the reported grant date and knowingly used hindsight to select a favorable date; that they knew that backdating grants to a date with a lower price violated the 1998 stock plan; and that their backdating caused each of Getty Images' Form 10-K and Form 10-Q for the relevant period to materially understate Getty Images' compensation expense and materially overstate Getty Images' net income or materially understate its net loss. *See, e.g.,* Am. Compl. ¶¶ 125-127, 201.  As in *Ryan*, Mr. Edmonds has alleged that: (1) the compensation committee had the authority to authorize the options[2] at issue and ensure that they were issued at fair market value as of the date of the grant; (2) the committee did not comply with the stock option plan by granting backdated stock options; and (3) the compensation committee then falsely represented to shareholders that the company was complying with the plan by preparing and signing financial and proxy statements.  This is enough at the pleading stage to demonstrate that the members of the compensation committee face a substantial likelihood of liability.

_____

[2]Mr. Edmonds acknowledges that the compensation committee was permitted to delegate its authority under the 1998 plan but its authority was limited as follows:

> The Committee may, but need not, from time to time delegate some or all of its authority under the Plan to an Administrator consisting of one or more members of the Committee or of one or more officers of the Company; provided, however, that the Committee may not delegate its authority (i) to grant Awards to Eligible Individuals (A) who are subject on the date of the grant to the reporting rules under Section 16(a) of the Exchange Act, (B) who are Section 162(m) Participants or (C) who are officers of the Company who are delegated authority by the Committee hereunder, or (ii) under Sections 3(b) and 17 of the Plan . . . . Nothing in the Plan shall be construed as obligating the Committee to delegate authority to an Administrator, and the Committee may at any time rescind the authority delegated to an Administrator appointed hereunder or appoint a new Administrator.

Am. Compl. ¶ 111.  Getty Images has not argued that the grants at issue were made by individuals other than those on the compensation committee.

ORDER – 15

Getting Images argues that Mr. Edmonds' allegations are mere conclusions and not specific facts. It claims: "No facts are pled tending to show that 'knowing hindsight' was used to select a 'favorable' date." Reply at 3. However, at the pleading stage it would be nearly impossible to plead "precisely what defendants knew about backdating . . . and exactly when they knew it." *CNET*, 483 F. Supp. 2d at 966.

Citing *CNET*, 482 F. Supp. 2d at 962-963 Getty Images argues that where there is an innocent explanation offered in addition to the more nefarious explanation that the court must accept the innocent explanation in the absence of other specific facts indicating fraud. Reply at 4. The court does not read *CNET* to suggest this proposition; rather, the court in *CNET* discussed the situation where a plaintiff sought to rely solely on the fact that the defendant corporation repriced its stock after an investigation, to argue that each instance of repricing was an admission of fraud. *Id.* This is not the case here.

Getty Images also cites *Desimone* which dismissed a complaint for failure to make a demand because the plaintiff failed to plead "facts creating a rational inference that the directors knowingly approved backdated grants of options, realizing that the corporation would deceptively account for them to investors and regulatory authorities . . . ." 924 A.2d at 915. Mr. Edmonds has made such allegations here. *See e.g.,* Am. Compl. ¶¶ 125-128, 201, 202.

The court is not persuaded by Getty Images' arguments. The court finds that the allegations in the complaint, if true, demonstrate that the members of the compensation committee face a substantial likelihood of liability. Because directors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead rises to a substantial likelihood, the court finds that the allegations in the complaint have raised a reasonable doubt that, as of the time the complaint was

ORDER – 16

filed, Mr. Bailey, Mr. Garb, and Mr. Sporborg could have properly exercised their

independent and disinterested business judgment in responding to a demand.

### III.  CONCLUSION

The court finds that Mr. Edmonds has pleaded particularized facts that create a

reasonable doubt that, as of the time the complaint was filed, the Board could have

properly exercised its independent and disinterested business judgment in responding to a

demand.  For the foregoing reasons the court DENIES Getty Images' motion to dismiss

for failure to make a litigation demand (Dkt. # 14).

DATED this 5th day of December, 2007.


_____
JAMES L. ROBART
United States District Judge

ORDER – 17